**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant*. | No. 4582-79 L<br>Judge Hewitt |
| THE ARAPAHO INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant.* | No. 4592-79 L<br>Judge Hewitt |

**TRIBES' STATEMENT IDENTIFYING OIL AND GAS PHASE TWO ISSUES**

Harry R. Sachse
*Counsel of Record*
Anne D. Noto
SONOSKY, CHAMBERS, SACHSE
ENDERSON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
(202) 682-0240 (Telephone)
(202) 682-0249 (Facsimile)
hsachse@sonosky.com
*Attorneys for Eastern Shoshone Tribe*

Richard M. Berley
*Counsel of Record*
Brian W. Chestnut
ZIONTZ, CHESTNUT, VARNELL,
BERLEY & SLONIM
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 (Telephone)
(206) 448-0962 (Facsimile)
rberley@zcvbs.com
*Attorneys for Northern Arapaho Tribe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... ii

I. FAILURE TO COLLECT OIL AND GAS ROYALTIES BASED ON PROPER VALUE OF PRODUCTION .................... 1

II. FAILURE TO COLLECT AMOUNTS DUE UNDER 1916 ACT LEASES BY ILLEGAL CONVERSION TO 1938 ACT LEASES .................... 8

III. FAILURE TO RESERVE MINERALS IN PATENTS UNDER THE 1905 ACT, AND FAILURE TO CORRECT PATENTS OR OTHERWISE PROTECT THE TRIBES' MINERAL INTERESTS IN PATENTED LANDS .................... 11

IV. FAILURE TO REQUIRE THAT LAND EXCHANGES BE FOR EQUAL VALUE UNDER 1939 ACT AND BE RESTRICTED TO SURFACE ACREAGE, AND FAILURE TO COLLECT AMOUNTS DUE ON MINERALS FROM SUCH LANDS .................... 15

V. FAILURE TO COLLECT FULL VALUE UNDER LEASES THROUGH UNCONSENTED OR WRONGFUL APPROVAL OF UNITIZATION AND COMMUTIZATION AGREEMENTS .................... 17

VI. FAILURE TO ENFORCE PROVISIONS REQUIRING TERMINATATION OF LEASES FOR NON-PRODUCTION .................... 19

VII. FAILURE TO REQUIRE COMPENSATION FOR DRAINAGE .................... 21

VIII. FAILURE TO COLLECT RENTAL PAYMENTS .................... 22

IX. INTEREST .................... 23

X. ATTORNEYS' FEES .................... 23

XI. RESERVED ITEMS .................... 24

**TABLE OF AUTHORITIES**

**CASES**

*Ash Sheep Co. v. United States*,
252 U.S. 159 (1920)....................9, 13

*Brewster v. Lanyon Zinc Co.*,
140 F. 801 (8th Cir. 1905)....................19

*Cherokee Nation of Okla. v. United States*,
26 Cl. Ct. 798 (1992)....................15, 16-17

*Citation Oilfield Supply & Leasing Ltd. v. Acting Billings Area Dir.*,
*Bureau of Indian Affairs*, 27 I.B.I.A. 210 (Mar. 7, 1995)....................20

*Florence E. Gallivan*,
60 I.D. 417 (1950)....................9

*Gordon v. Empire Gas & Fuel Co.*,
63 F.2d 487 (5th Cir. 1933)....................19

*Mitchell v. United States*,
10 Cl. Ct. 787 (1986)....................14-15, 16

*Navajo Tribe of Indians v. United States*,
9 Cl. Ct. 227 (1985)....................22

*Osage Nation v. United States*,
57 Fed. Cl. 392 (2003)....................8

*Poafpybitty v. Skelly Oil Co.*,
390 U.S. 365 (1968)....................5

*Shoshone Indian Tribe v. United States*,
51 Fed. Cl. 60 (2001)....................8

*Shoshone Indian Tribe v. United States*,
56 Fed. Cl. 639 (June 9, 2003)....................2, 5

*Shoshone Indian Tribe v. United States*,
364 F.3d 1339 (Fed. Cir. 2004),
*cert. denied* 125 S. Ct. 1824 (April 18, 2005)....................7, 8, 13, 23

*Swendig v Wash. Water Power Co.*,
265 U.S. 322 (1924 )....................13

*United States v. Mitchell*,
463 U.S. 206 (1983).....5

*United States v. Navajo Nation*,
537 U.S. 488 (2003).....5

*United States v. Shoshone Tribe*,
304 U.S. 111 (1938).....9

*United States v. White Mountain Apache*,
537 U.S. 465 (2003).....13, 14

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 64-975 (1916).....9

S. Rep. No. 64-712 (1916).....9

Statement of Martin Toscan Bennett Before the Subcomm. on Indian Affairs, S. Comm. on Interior and Insular Affairs, Sept. 25, 1970.....18

Presidential Order of August 2, 1912.....9

1 Fed. Reg. 2296 (Nov. 20, 1936).....4

**REGULATIONS**

25 C.F.R. § 171.21(b) (1957).....17

25 C.F.R. § 171.16,
*recodified at* 25 C.F.R. § 211.16 (for leases under 1938 Act).....7

25 C.F.R. § 171.30,
(24 Fed. Reg. 7949, Oct. 2, 1959).....4

25 C.F.R. § 184.15, *recodified at* 25 C.F.R. § 227.15.....7

25 C.F.R. § 211.27(a).....10

25 C.F.R. § 211.47(b).....21

25 C.F.R. § 227.12.....12

25 C.F.R. § 227.23.....21

25 C.F.R., Part 184 (1958).....9

30 C.F.R. § 206.103 (1987) ....................................................................4

30 C.F.R. § 221.12 (1942) ....................................................................22

30 C.F.R. § 221.16 (1942) ....................................................................22

30 C.F.R. § 221.47 (1942) ....................................................................2, 3, 4

30 C.F.R. § 221.50(c) (1942) ....................................................................7

30 C.F.R. § 221.51 (1942) ....................................................................7

42 C.F.R. § 401.24 (1951 Supp) ....................................................................12

**STATUTES**

Act of February 28, 1891, 26 Stat. 785,
*as amended* by the Act of May 29, 1924, ch. 210, 43 Stat. 244 ........................2

Act of March 3, 1905, ch. 1452, 33 Stat. 1016 .............................................. *passim*

Act of Aug. 21, 1916, Pub. L. No. 218, ch. 363, 39 Stat. 519 ....................... *passim*

Act of July 27, 1939 ch. 387, 53 Stat. 1128,
*codified at* 25 U.S.C. § 575................................................................10, 15, 16

Act of Nov. 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915 ....................................8

Act of Nov. 13, 1991, Pub. L. No. 102-154, 105 Stat. 990 ....................................8

Act of Oct. 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374......................................8

Act of Nov. 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379 ..................................8

Act of Sept. 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499 ..................................8

Act of April 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321..................................8

Act of Sept. 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009 ..................................8

Act of Nov. 14, 1997, Pub. L. No. 105-83, 111 Stat. 1543 ....................................8

Act of Nov. 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501 ..................................8

Act of Oct. 11, 2000, Pub. L. No. 106-291, 114 Stat. 922......................................8

Act of Nov. 5, 2001, Pub. L. No. 107-63, 115 Stat. 414 ........................................8

Act of Feb. 20, 2003, Pub. L. No. 108-7, 117 Stat. 11 ..........................................8

Act of Nov. 10, 2003, Pub. L. No. 108-108, 117 Stat. 1241 ..................................8

Equal Access to Justice Act, 28 U.S.C. § 2412 ..................................................23

Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347, *codified at*
25 U.S.C. §§ 396a-396g.......................................................................... *passim*

Indian Claims Commission Act, ch. 959, 60 Stat. 1052 (1946) ..............................7

Indian Mineral Development Act of 1982, Pub. L. No. 97-382,
96 Stat. 1938, *codified at* 25 U.S.C. §§ 2101-2108 ..........................................2

Mineral Leasing Act of February 25, 1920,
30 U.S.C. § 181 *et seq.* (1946 ed.).....................................................................2

25 U.S.C. § 396a.................................................................................................10

28 U.S.C. § 2412(b) ...........................................................................................23

28 U.S.C. § 2412(d)(1)(B) .............................................................................. 23-24

28 U.S.C. § 2412(d)(2)(A)..................................................................................23

30 U.S.C. § 81......................................................................................................12

30 U.S.C. § 121-125 ............................................................................................12

43 U.S.C. § 141....................................................................................................12

**MISCELLANEOUS**

76 Am. Jur. 2d Trusts § 736 (1988 & Supp. 2002)...............................................24

Howard R. Williams & Charles J. Meyers,
*Oil & Gas Law* § 861 (2d ed. 2004)................................................................19

G. Bogert, *The Law of Trusts and Trustees* § 799 (2d ed. 1981)..........................22

Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-1974,
Vol. II, Solicitor's Opinion M-28614 (Oct. 1, 1936) (Washington GPO).......13

Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-1974,
Vol. II, Solicitor's Opinion M-36172 (June 18, 1953) (Washington GPO) ....13

## TRIBES' STATEMENT IDENTIFYING OIL AND GAS PHASE TWO ISSUES

Pursuant to the Court's Order of June 6, 2005, Plaintiffs Eastern Shoshone and Northern Arapaho Tribes (collectively "Tribes") hereby submit their statement identifying the issues to be resolved in the Oil and Gas Phase II portion of this litigation. As required by the Court, this Statement includes types of damages claimed, legal theories supporting recovery, and time frames for which recovery is sought. Because discovery is ongoing, and the Tribes are still analyzing and investigating the voluminous material it received from the Government in 2005, the Tribes may update this identification of issues. Order of June 6, 2005, at 2, ¶ 1. As also indicated in that Order, the Tribes' claims in this subdocket include royalty accounting and related oil and gas valuation and collection issues for the period prior to October 10, 1973, which are similar to those pursued in the prior oil and gas phase of this litigation for claims for the period from October 10, 1973, to December 31, 2000. In addition, the Tribes have a series of claims concerning implementation and enforcement of lease terms, statutes, and regulations relating to more discrete transactions or occurrences which transpired both before and after October 10, 1973.

### I. FAILURE TO COLLECT OIL AND GAS ROYALTIES BASED ON PROPER VALUE OF PRODUCTION.

The Tribes claim that the Government is liable for mismanaging the Tribes' trust oil and gas resources by, without limitation, failing to collect from lessees the proper amounts due in royalties under federal regulations and lease terms establishing the proper value of oil and gas production for royalty purposes. The damages include, but are not limited to, the difference

between royalties actually collected and royalties that should have been collected under federal law.[1]

Valuation of oil and gas production for royalty purposes has been governed for all relevant periods by a series of regulations that establish standards for the Government's supervision of oil and gas production on Indian reservations. The regulations implement a statutory oil and gas development scheme which includes the Act of February 28, 1891 (26 Stat. 785) as amended by the Act of May 29, 1924 (ch. 210, 43 Stat. 244), the Mineral Leasing Act of February 25, 1920 (30 U.S.C. §§ 181 *et seq.*), the Indian Mineral Leasing Act of 1938 (25 U.S.C. §§ 396a-396g) ("1938 Act" or "IMLA"), and a special Act authorizing oil and gas development on the Wind River Reservation, the Act of August 21, 1916 (Pub. L. No. 218, ch. 363, 39 Stat. 519) ("1916 Act").[2] The language of a key valuation regulation, in effect since at least 1942, has already been analyzed by this Court in an earlier phase of this case, in an Opinion reported at 56 Fed. Cl. 639 (June 9, 2003). The regulation provides that the federal supervisor should value oil and gas production for royalty purposes as follows:

> The value of production, for the purpose of computing royalty shall be the estimated reasonable value of the product as determined by the supervisor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, to the price received by the lessee, to posted prices and to other relevant matters. Under no circumstances shall the value of production of any of said substances for the purposes of computing royalty be deemed to be less than the gross proceeds accruing to the lessee from the sale thereof or less than the value computed on such reasonable unit value as shall have been determined by the Secretary. In the absence of good reason to the contrary, value computed on the basis of the highest price per barrel, thousand cubic feet, or gallon paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold

[1] As discussed in § XI below, the current phase of oil and gas issues addresses breaches of trust up to when funds were or should have been paid to the United States as trustee for the Tribes. Issues related to mismanagement of funds after first receipt by the United States will be addressed in later phases of this litigation.

[2] Reservation mineral agreements are now often entered into under the Indian Mineral Development Act of 1982, Pub. L. No. 97-382, 96 Stat. 1938, codified at, 25 U.S.C. §§ 2101-2108 ("1982 Act"), which was designed to accord greater flexibility and tribal control regarding reservation mineral development. None of the claims referenced in this section relate to agreements under the 1982 Act.

> from the field or area where the leased lands are situated will be considered to be a reasonable value.

30 C.F.R. § 221.47 (1942); *see* J.A. of Regulations (prepared in accordance with the Court's Order of May 15, 2003), at C-10.

The regulation requires that the Government supervisor determine the reasonable value of production, taking into account a number of factors. Gross sale proceeds received by the oil company is one factor only, and the regulation provides that "reasonable value" on which royalties are to be determined is "under no circumstances" to be lower than gross proceeds. Throughout the relevant time period, the Government was concerned about price manipulations in the integrated oil industry which might put royalty owners at a disadvantage, and provided by regulation for alternative mechanisms to determine what a reasonable value would be "in a fair and open market." "Due consideration" must be given to the highest price paid for part or a "majority of production of like quality" from the field, as well as "posted prices," a competitive market indicator used to solicit sales in the field. 30 C.F.R. § 221.47 (1942). Furthermore, the reasonable value of production was supposed to reflect what is currently known as "major portion analysis": "In the absence of good reason to the contrary," the reasonable value of production is to be "the highest price value per barrel" or other unit of production, "paid or offered . . . in a fair and open market for the major portion of like-quality oil, gas or other products . . . ." *Id.*

*Failure to Employ Alternative Valuation Techniques.* Oil and gas development on the Wind River Reservation was largely undertaken by large integrated oil companies, who typically sold to themselves or their affiliates rather than "in a fair and open market." To the Tribes' best knowledge and belief, the Government never undertook "major portion analysis," or any other valuation technique designed to determine fair value of production for royalty purposes "in a fair

and open market" during the years at issue. Instead, it collected royalties based, at most, on the lessee's reported gross proceeds. This means royalties were collected on, at most, the minimum value of production, rather than its "reasonable value" under the regulation. To make matters worse, the Government, in its management of nearby non-tribal federal leases, often took federal royalties in kind, while not doing so in its management of tribal leases. This technique is typically used when the royalty owner has reason to believe the open market will yield a significantly higher value per unit of production than is reported by the operator.

Language providing for major potion analysis to determine value for royalty purposes in a fair and open market appears in federal regulations governing production from tribal lands at least as far back as 1936. *See, e.g.*, 1 Fed. Reg. 2296, 2300 (Nov. 20, 1936). Provisions implementing such regulations also appear in the oil and gas leases themselves, which were federal forms prescribed by regulation. *See, e.g.*, 25 C.F.R. § 171.30 (24 Fed. Reg. 7949, Oct. 2, 1959). Valuation provisions referencing major portion analysis appear in leases issued as early as 1937. *See* BIA Form 5-157 (June 1939)). They appear in leases issued under the various Indian oil and gas leasing statutes.

Data is available regarding sale prices in the vicinity of the Reservation for the pre-1973 period which would assist in determining "reasonable value" of production in a "fair and open market." Such prices often differ significantly from proceeds received for like-kind production on which royalties were collected for the Tribes. Damages include, without limitation, a calculation based on the difference.

In its 2003 Opinion, this Court addressed regulatory language virtually identical to the above-quoted portion of 30 C.F.R. § 221.47 (1942) (with "Associate Director" replacing "supervisor" in a re-numbered regulation, 30 C.F.R. § 206.103 (1987)), and analyzed whether

the discretion accorded the Government in valuing oil and gas was consistent with a money-mandating duty which could support a breach of trust claim for damages. This Court held that the regulation limited the Government's discretion, and that the Government's performance could be evaluated by the Court:

> This regulation provides the Secretary with guidelines within which to exercise her discretion, and provides the court with guidelines within which to evaluate the Secretary's action. The court does not agree with the government that the fact that the value is "as determined by the Associate Director" is, in the context of the regulation, an indication that the supervisor's action is entirely discretionary. Such an interpretation would render the balance of the regulation (e.g., the words "shall be the estimated reasonable value") meaningless, a result to be avoided in statutory interpretation.

56 Fed. Cl. 639, 649 (2003) (citation omitted). The Court denied the Government's motion to dismiss the Tribes' claims that the Government failed to collect royalties based on the "reasonable value" of oil and gas as prescribed in the regulation.

The Court's Opinion was issued following the U.S. Supreme Court's ruling in *United States v. Navajo Nation*, 537 U.S. 488 (2003), that the Government did not have a "money-mandating duty" under IMLA to negotiate a higher than minimum royalty in coal leases. *Navajo Nation* relied in turn on *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), which held that whether the Government can be held liable to tribes for damages for mismanaging trust resources depends upon whether the statutes and regulations governing the activity "can fairly be interpreted as mandating compensation by the Federal Government." *Id.* at 218. However, in *Navajo Nation,* the Supreme Court contrasted the Government's limited duties regarding coal with its considerably broader duties regarding reservation oil and gas – *see, e.g.*, 537 U.S. at 494-95 – and specifically reserved the issue of whether the Government would have such a money-mandating duty with respect to oil and gas. *Id.* at 507 n.11. The Supreme Court's analysis in *Navajo Nation* was consistent with earlier holdings that "the United States has exercised its

supervisory authority over oil and gas leases in considerable detail." *See, e.g., Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365 (1968). This Court then examined a series of oil and gas regulations, which covered different periods within the 1973 through 2000 timeframe which was then before it, and held that the Government's role in the valuation of oil and gas created a money-mandating duty that would support damages against the Government for failure to collect royalties based upon such value.

*Failure to Collect Royalties on Gross Proceeds.* As indicated above, the Government had the duty under its regulations and its mandated lease terms to collect royalties based on reasonable value using gross proceeds as a *minimum* indicator of such value. To the Tribes' best knowledge and belief, however, the Government often failed to collect even those funds. At times, oil companies paid royalties not on the full amount of gross proceeds received from sales, but on gross proceeds less certain claimed deductions, such as processing, hauling, transportation, state taxes and other charges. Except for those instances in which such deductions were explicitly permitted by law, or were taken in lawfully permitted amounts, the Tribes are entitled to added damages based on royalties they should have received on improper deductions from gross proceeds.

In addition, the duty to collect royalty on gross proceeds required the Government to collect royalties on *all* production. At times, oil companies did not pay royalties on either the reasonable value or actual proceeds of valuable by-products removed from the oil and gas streams during processing, including high-BTU liquid hydrocarbons removed from natural gas, or elemental sulfur removed and sold from "sour" production. In determining the reasonable value of such by-products, oil companies were permitted to deduct reasonable processing costs from downstream sales prices, and would be required to pay an additional royalty on such by-

product sales if the proceeds following such deductions exceeded the proceeds of sale of the unprocessed production ("dual accounting"). *See, e.g.*, 30 C.F.R. §§ 221.50(c), 221.51 (1942) (J.A. at C-11). To the Tribes' best knowledge and belief, however, the Government failed to require such dual accounting, depriving the Tribes of the royalty to which they were entitled on the reasonable value of such by-products, including but not necessarily limited to gross proceeds.

*Timeliness of Collection and Remittance.* Royalties during all relevant periods were required to be paid no later than the last day of the calendar month following the production. This requirement was a consistent element of governing federal regulations (*see, e.g.*, 25 C.F.R. § 184.15, *recodified at* 25 C.F.R. § 227.15 (for leases under the 1916 Act); 25 C.F.R. § 171.16, *recodified at* 25 C.F.R. § 211.16 (for leases under 1938 Act); *see* J.A. at B-14-15), and the federally-mandated lease forms. To the Tribes' best knowledge and belief, however, the Government often failed to require that lessees pay royalties timely. The Tribes are entitled to damages for the Government's failure to collect such amounts timely, so that they could be deposited in the Tribes' interest-bearing trust accounts. *See Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1350 (Fed. Cir. 2004), *cert. denied* 125 S. Ct. 1824, 1826 (Apr. 18, 2005).

*Time Periods.* The time period at issue with respect to the above claims is all periods prior to October 10, 1973. The earliest date of this time period has not yet been finally determined. The Petitions in this action sought damages for breaches of trust occurring as far back as August 14, 1946, a date established by the Indian Claims Commission Act (ch. 959, 60 Stat. 1052 (1946)) ("ICC Act"). The Tribes have filed a Motion to Amend their Petitions, which is pending before the Court and which would permit recoveries for breaches of trust occurring as early as 1868 for the Eastern Shoshone Tribe and 1878 for the Northern Arapaho. The Tribes seek recovery for the pre-October 10, 1973, period pursuant to the Federal Circuit's ruling in

*Shoshone, supra,* that certain Appropriations Acts[3] specifically preserve these claims. In addition, this Court's ruling in *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003), which relied on its earlier ruling herein (*Shoshone Indian Tribe v. United States,* 51 Fed. Cl. 60 (2001)), held that the ICC Act did not bar pre-1946 claims within the scope of the Appropriations Acts.

The date of the earliest oil and gas transactions concerning which the Tribes currently have usable data, and thus the earliest date to which Tribes' claims for failure to collect amounts due under leases might currently extend, is believed to be July 6, 1917. The earliest dates for which the Tribes currently have data indicating differentials between prices paid on the Reservation and in an off- Reservation "fair and open market," indicating that the Tribes failed to receive royalties based on "reasonable value" under the regulations, are from the mid-1930's. These dates are subject to amendment if and when more information becomes available. The Tribes are permitted under the Court's scheduling Order to update this identification of issues. Order of June 6, 2005, at 2, ¶ 1. At this stage, however, the Tribes believe that significant changes from these dates are unlikely.

## II. FAILURE TO COLLECT AMOUNTS DUE UNDER 1916 ACT LEASES BY ILLEGAL CONVERSION TO 1938 ACT LEASES.

In 1904, at the insistence of the United States, the Shoshone and Arapahoe Tribes did "cede, grant, and relinquish to the United States, all right, title, and interest" in 1,480,000 acres, representing about two-thirds of their reservation. The ceded lands were that part of the reservation north and east of the Big Wind River and the Little Wind River or Popo-Agie River.

[3] Act of Nov. 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915; Act of Nov. 13, 1991, Pub. L. No. 102-154, 105 Stat. 990; Act of Oct. 5, 1992, Pub. L. No. 102-381, 106 Stat. 1374; Act of Nov. 11, 1993, Pub. L. No. 103-138, 107 Stat. 1379; Act of Sept. 30, 1994, Pub. L. No. 103-332, 108 Stat. 2499; Act of Apr. 26, 1996, Pub. L. No. 104-134, 110 Stat. 1321; Act of Sept. 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009; Act of Nov. 14, 1997, Pub. L. No. 105-83, 111 Stat. 1543; Act of Nov. 29, 1999, Pub. L. No. 106-113, 113 Stat. 1501; Act of Oct. 11, 2000, Pub. L. No. 106-291, 114 Stat. 922; Act of Nov. 5, 2001, Pub. L. No. 107-63, 115 Stat. 414; Act of Feb. 20, 2003, Pub. L. No. 108-7, 117 Stat. 11; Act of Nov. 10, 2003, Pub. L. No. 108-108, 117 Stat. 1241.

The United States undertook to dispose of the ceded lands under the "homestead, town-site, coal, and mineral land laws, or by sale for cash," and agreed to pay the Indians the amounts received by the Government. Agreement of Apr. 21, 1904, *approved by* the Act of March 3, 1905, ch. 1452, 33 Stat. 1016, art. I, II. The Tribes remained the equitable owners of the land and minerals, with the United States as trustee for purposes of disposing of the land. *United States v. Shoshone Tribe*, 304 U.S. 111, 114 (1938); *Florence E. Gallivan*, 60 I.D. 417, 418 (1950); *see also Ash Sheep Co. v. United States*, 252 U.S. 159 (1920). Through the years, beginning about 1906, portions of the 1904 "ceded" lands were entered, homesteaded, or purchased for cash, and after 1920 taken up under the reclamation-homestead laws.

Around 1910, it became apparent that much of the 1904 ceded land was potentially valuable for oil and gas. The Secretary of the Interior had approved oil and gas leases on some allotted Indian lands, but under then-existing law he had no authority to lease "undisposed of" ceded lands for oil and gas development. To protect the Tribes' interest pending legislation, the lands then considered potentially valuable for oil and gas were withdrawn as a petroleum reserve by Presidential Order of August 2, 1912 (*see* S. Rep. No. 64-712 (1916); H.R. Rep. No. 64-975 (1916)).

In order for the Tribes to benefit from oil and gas deposits within the ceded portion of the reservation, Congress in the 1916 Act empowered the Secretary of the Interior to lease the "ceded" lands for oil and gas development "under such terms and conditions as shall be by him prescribed" with the proceeds, bonuses, and royalties from the leases to be "applied to the use and benefit of said tribe." Pursuant to the 1916 Act, the Secretary promulgated regulations governing leasing and production of oil and gas within the ceded portion of the Reservation on Apr. 16, 1917, which were codified, as amended, in 25 C.F.R., Part 184 (1958).

The 1916 Act itself, however, and consequently the leases made under it, have a provision of great benefit to the Tribes. Congress provided in the 1916 Act that any lease under the Act "shall be for a period of twenty years with the preferential right of the lessee to renew the same for successive periods of ten years each upon such reasonable terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the time of expiration of any such period . . . ." This provides an opportunity to increase the royalty to the Tribe after the oil company has recovered its costs and made a fair profit. In contrast, leases under the 1938 Act are all for the same term – an initial period not to exceed 10 years and "as long thereafter as minerals are produced in paying quantities." 25 U.S.C. § 396a; 25 C.F.R. § 211.27(a). If a lease under the 1938 Act provided for a royalty of 1/8th (12.5%) to the Tribes, the royalty remains at that rate until all recoverable oil and gas is removed from the leased lands, even if the oil company has earned back its costs many times over and is making huge profits from the lease with decades to go. The Government's violation of the 1916 Act lease renewal provisions resulted in significant lost trust funds to the Tribes.

The Secretary entered into numerous 1916 Act leases for the Tribes through 1939, when Congress ceased the disposal of ceded lands and restored to the Reservation all ceded lands not disposed of, except certain lands within the Riverton Reclamation District. Act of July 27, 1939 ch. 387, 53 Stat. 1128, 1129, § 5 (*codified at* 25 U.S.C. § 575). No law has ever been passed that relieved the lessees from their obligations under these 1916 Act leases, and the Tribes have benefited significantly from the provision allowing a renewal of terms every ten years after the first 20-year term. Over time, 1916 Act leases were renewed with increased royalties up to 25%.

The Secretary, however, at the request of several oil companies, converted at least the following 1916 Act leases to 1938 Act leases, unlawfully freezing the royalty rate at 12.5%:

*Steamboat Butte:*

(1) I-96 Ind-7736
(2) I-96-Ind-7737

*Maverick Springs:*

(1) I-96-Ind-7745
(2) I-96-Ind-7746
(3) I-96-Ind-7747
(4) I-96-Ind-7748
(5) I-96-Ind-7749

As discovery is ongoing, additional conversions may be discovered and claimed.

These conversions were illegal, costing the Tribes the difference in royalty that they could have obtained if these leases had remained 1916 Act leases. This Court has already held that the duty of the Secretary to collect the royalty due under a lease is a money-mandating obligation. The same is true of the duty of the Secretary to enforce the terms of existing leases, and not to modify those terms to the detriment of the Tribes, contrary to law.

*Time Periods.* To the best of the Tribes' present knowledge and belief, unlawful conversion of 1916 Act leases into 1938 Act leases occurred between the early 1940's and the mid 1950's. The time period for which damages are sought begins on the date of each such conversion and extends to December 31, 2000.

## III. FAILURE TO RESERVE MINERALS IN PATENTS UNDER THE 1905 ACT, AND FAILURE TO CORRECT PATENTS OR OTHERWISE PROTECT THE TRIBES' MINERAL INTERESTS IN PATENTED LANDS.

The United States in a number of instances issued patents on tribal land ceded in trust pursuant to the Act of March 3, 1905 (ch. 1452, 33 Stat. 1016) ("1905 Act") without expressly reserving the minerals in violation of that Act and subsequent acts, cited below, requiring reservation of mineral deposits. As a result of that failure, and the failure each year of the United States to correct the patents or otherwise protect the Tribes' mineral estate in such lands, the

United States breached its trust obligation to the Tribes by failing to collect for the Tribes their share of the proceeds generated from production of minerals from such lands as required by Article IX of the 1905 Act.

In the 1905 Act, Congress "accepted, ratified, and confirmed" an agreement dated Apr. 21, 1904, between the Tribes and the United States for the opening of the Tribes' Reservation to non-Indian settlement. 33 Stat. at 1019. Under Article II of the 1905 Act, the United States agreed "to dispose of the [opened lands] as hereinafter provided under the provisions of the homestead, town-site, coal and mineral land laws, or by sale for cash, as hereinafter provided . . . ." *Id.* at 1016. Fulfillment of this agreement was specifically made a trust obligation under Article IX of the 1905 Act, which provides "it being the understanding that the United States shall act as trustee for said Indians to dispose of said lands and to expend for said Indians and pay over to them the proceeds . . . ." *Id.* at 1018. The United States breached this trust obligation in failing to specifically reserve the minerals, in failing to reform the patents, in failing to bring an action in trespass, or otherwise enforce the Tribal ownership of the minerals.

The United States issued patents that, without authority, failed to reserve the mineral rights as required by applicable law. Beginning in 1909, the mineral laws limited the issuance of homestead patents without reservation of minerals. *See, e.g.*, 30 U.S.C. § 81; 43 U.S.C. § 141; 30 U.S.C. §§ 121-125; 1916 Act; 42 C.F.R. § 401.24 (1951 Supp.); 25 C.F.R. § 227.12. Because the 1905 Act required the United States to follow the requirements of the homestead, coal and mineral laws, this failure to reserve minerals was a breach of the trust obligations of Articles II and IX of the 1905 Act. But even more, the Secretary continually breached this obligation by failing to assert the invalidity of the patentees' claims to mineral estates, or to collect the revenues for the Tribes.

In issuing a patent, the Executive branch of the Government derives its entire authority from acts of Congress. "The issuing of the patents without a reservation did not convey what the law reserved. They are to be given effect according to the laws and regulations under which they were issued." *Swendig v. Wash. Water Power Co.*, 265 U.S. 322, 332 (1924). Specifically as to mineral interests that should have been, but were not, reserved, the Solicitor of the Department of the Interior in a formal opinion has held that the statute of limitations on revoking a patent does not apply to interpreting a patent as having reserved minerals when the law so required. *See* Ops. of the Solicitor of the Dep't of the Interior Relating to Indian Affairs 1917-1974, Vol. II, Op. of Solicitor Margold, M-28614, at 680 (Oct. 1, 1936), and citations therein.

Consequently, the minerals which were required to be reserved under the 1905 Act and various mineral reservation Acts remain beneficially owned by the Tribes, and the United States was and is obligated to collect the revenues from their development for the Tribes. Pursuant to the trust obligations of Article IX of the 1905 Act, the Department of Interior has long held that "until final disposition of the lands the United States would hold the lands as trustee for the Indians, and any *proceeds* which may be derived . . . for the use thereof, would belong to the Indians as the beneficial owners." *Id.* at Solicitor's Op. M-36172, at 1608 (June 18, 1953), *citing Ash Sheep Co. v. United States*, 252 U.S. 159 (1920). Under the Federal Circuit's opinion in this case, *Shoshone Tribe v. United States*, 364 F.3d 339, 1350 (Fed. Cir. 2004), *cert. denied* 125 S. Ct. 1824 (Apr. 18, 2005), the failure to collect proceeds from minerals expressly held in trust under the agreement with the Tribes, which was confirmed by the 1905 Act, resulted in actionable "losses to . . . trust funds" under the Appropriations Acts. *See* n. 3, *supra.*

The United States as trustee had an obligation to collect these funds. Like the act analyzed in *United States v. White Mountain Apache*, 537 U.S. 465, 475 (2003), the 1905 Act

expressly defined a fiduciary relationship and accorded the United States complete control over the property. As the Supreme Court found regarding the trust property in *White Mountain Apache*, the property held expressly subject to a trust supports a fair inference that an obligation to preserve the property was incumbent on the United States as trustee. 537 U.S. at 475. "This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *Id*. In the instant case, the United States has allowed minerals to be extracted from such lands without any effort to collect the proceeds derived therefrom as required by the 1905 Act, or to reform the patents to show the mineral reservation, or to interpret the patents as reserving minerals to the United States and issue leases under the 1916 Act -- which was passed to provide the United States as trustee with the tools to assure that the Tribes' would receive the benefits from the discovery and development of oil and gas in the lands under the 1905 Act -- or subsequently under the 1938 Act, or later acts. *See* §§ I and II above.

Measuring the Tribes' damages for loss of trust funds due to the issuance of patents not in accordance with the 1905 Act will be relatively straightforward. Lands subject to this claim are intermingled with tribal leases. Volumes of production for those lands in many instances can be ascertained because they were developed under unitization or communitization agreements with tribal leases, and relative allocations are known. In other instances, third party sources of documents provide volume information. The value of each unit of oil or gas production has been or will be established under the royalty valuation claims in this case, or other appropriate valuation standard.

*Time Period*. The failure each year of the Secretary to see that the Tribes receive the benefit of minerals that were by operation of law reserved when patents were granted, or which

the Secretary had a duty to reserve and could have done so by reform of the patents, is a continuing claim, occurring each year that funds were not collected. *See Mitchell v. United States*, 10 Cl. Ct. 787, 788 (1986) (United States had a duty to replant stands of trees that had been harvested and "on each day the BIA failed in its duty to regenerate a given stand, there arose a new cause of action"). *See also Cherokee Nation of Okla. v. United States*, 26 Cl. Ct. 798 (1992) (concerning mineral trespasses on the Tribe's riverbed land more than six years before the suit was brought). Applying the continuing claim doctrine, the *Cherokee* court concluded: "Consequently, in the instant case, claims that first accrued before Apr. 21, 1983, but which continued extant during the six year statutory period potentially remain actionable." *Id.* at 804.

The damage claims due to the failure of the United States as trustee to fulfill its obligations to protect the Tribes' mineral interests in lands patented under the 1905 Act, begin in 1909 for coal and 1914 for oil and gas and continue through December 31, 2000, in this litigation. Alternatively, damages are due under the continuing claim doctrine for the period from October 10, 1973, through December 31, 2000.

## IV. FAILURE TO REQUIRE THAT LAND EXCHANGES BE FOR EQUAL VALUE UNDER 1939 ACT AND BE RESTRICTED TO SURFACE ACREAGE, AND FAILURE TO COLLECT AMOUNTS DUE ON MINERALS FROM SUCH LANDS.

Pursuant to the Act of July 27, 1939 (ch. 387, 53 Stat. 1128, *codified at* 25 U.S.C. § 575) ("1939 Act") the United States as trustee was authorized to consolidate Indian and non-Indian land holdings within the Reservation. In so doing, the United States was authorized to exchange tribal trust lands for fee lands only "on the basis of equal value." This requirement was violated in instances where minerals were not reserved in the Indian land exchanged, and alternatively where the value of the minerals was not taken into account when the exchanges were approved.

For example, in one instance in 1944 the Secretary approved an exchange of 251 acres of non-Indian agriculture lands with little mineral value for 5,128 acres of Tribal lands with large coal, oil, and gas deposits. The Tribes also contend that the 1939 Act only contemplated exchanges of surface estates and that no mineral transfers were authorized. At the time of 1939 Act, the 1916 Act already recognized the Tribes' beneficial ownership of the minerals under such lands and authorized their disposition by lease.

The United States breached its trust responsibility to the Tribes by, without limitation, failing to collect payments for the value of minerals under exchanged lands at the time of the exchange; failing to reserve such minerals in the patents when the exchanges were made; failing to reform the patents; and failing to bring an action in trespass or otherwise to enforce the Tribes' ownership of the minerals. Measuring the Tribes' damages for loss of trust funds due to the issuance of exchange patents will be relatively straightforward, and should be determinable in the same manner as described in § III above.

*Time Period*. Likewise, the Secretary's failure to see to it that the Tribes receive the benefit of minerals that were not subject to conveyance when exchanges were made, or when unlawful deeds or patents were granted, is a continuing claim, as is the Secretary's failure to reform such deeds and patents. *See* § III above. The damage claims due to the failure of the United States as trustee to fulfill its obligations to protect the Tribes' mineral interests in lands exchanged or patented under the 1939 Act, begin in 1939 and continue through December 31, 2000. Alternatively, damages are due under the continuing claim doctrine for the period from October 10, 1973, through December 31, 2000.

## V. FAILURE TO COLLECT FULL VALUE UNDER LEASES THROUGH UNCONSENTED OR WRONGFUL APPROVAL OF UNITIZATION AND COMMUTIZATION AGREEMENTS.

Under Indian oil and gas leases, and oil and gas leases in general, the oil company lessee undertakes to "drill and produce all wells necessary to offset or protect the leased land from drainage, or in lieu thereof to, to compensate the lessor (the Tribes) in full each month for the estimated loss of royalty through drainage." *See*, *e.g.*, Lease No. 14-20-0258-2286, § 3(b)(1) (Sept. 1, 1968); Lease No. 14-20-258-32, § 3(b)(2) (Nov. 7, 1952). When, however, there are multiple leases from different lessors overlaying the same pool of oil, it is usually to the advantage of the various oil companies to enter into a unitization or communitization agreement.[4] Under such agreements, one well is typically designated as the unit well, and the production from that well is attributed to all the lease holders, rather than requiring each oil company to drill a well on its lease to protect the interest of its lessor. This is to the tremendous advantage of the oil companies, which bear the costs of production.

On Indian reservations, Indian land can only be included in a unit with the consent of both the Secretary of the Interior and the relevant tribe. 25 C.F.R. § 171.21(b) (1957). One of the oldest and most productive fields in the Wind River Basin is Winkleman Dome. In 1960, the five companies operating in the field requested unitization of operations for a number of reasons to the advantage of the oil companies and to the possible detriment of the Tribes. The Tribes, on the advice of an experienced oil and gas consultant, proposed to enter into the unitization agreement (not required under its lease) only if the companies paid the Tribes an increased royalty, or additional compensation of $100,000 per year for ten years, and so informed the

[4] Communitization ("pooling") agreements are generally used to combine small or irregular tracts into a unit large enough to meet spacing regulations for drilling. Unitization agreements are generally used to share and reduce the costs and risks of exploration or to combine leased tracts on a field or reservoir-wide scale so that many tracts may be treated as one to facilitate operations like secondary recovery.

Secretary. This would have taken only a small part of the total additional profit the producers expected to receive. The oil companies objected, and the Secretary of the Interior overrode the Tribes' condition on July 19, 1962, permitting the unitization without any additional compensation to the Tribes. He did so despite his own regulation in effect at the time, *id*., that "no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected." *See* Statement of Martin Toscan Bennett Before the Subcomm. on Indian Affairs, S. Comm. on Interior and Insular Affairs, Sept. 25, 1970.

On information and belief, the Tribes allege that this is not the only instance in which the Secretary entered into unitization or communitization agreements favorable to oil companies not required under the tribal leases without requiring any additional compensation for the Tribes. The Secretary did so either without the consent of the Tribes, overriding the consent of the Tribes, or incorrectly advising the Tribes to consent against their interest.

These actions violate the money-mandating obligation of the Secretary to enforce the terms of Indian mineral leases, or if the Secretary modifies those terms to do so in a manner that protects tribal interests and is consistent with the Secretary's own regulations. The damages to the Tribes are the bonuses or increased royalties the Tribes would have otherwise received as consideration for their consent.

*Time Periods.* The time period for this claim with respect to the specific example described above extends from July 19, 1962, through December 31, 2000. The time period with respect to similar failures to enforce lease conditions requiring the Tribes' approval of unitization or communitization agreements similarly extend from the date of each such agreement to December 31, 2000.

## VI. FAILURE TO ENFORCE PROVISIONS REQUIRING TERMINATATION OF LEASES FOR NON-PRODUCTION.

By their own terms, with the exception of the special requirements of the 1916 Act leases described in § II above, the Tribes' oil and gas leases remain in effect for a set primary term and as long thereafter as oil or gas is produced in paying quantities. For example, the 1947 lease form for leases made pursuant to the 1938 Act provides that a lease will continue for a term of 10 years and "as much longer thereafter as oil and/or gas is produced in paying quantities from said land." *See, e.g.*, Lease No. 14-20-258-102, § 1 (Aug. 24, 1954); Lease No. 14-20-0258-2286, § 1 (Sept. 1, 1968). Such lease terms have long been standard industry practice. *See, e.g.*, *Gordon v. Empire Gas & Fuel Co.*, 63 F.2d 487, 488 (5th Cir. 1933) (noting that leases with such provisions are common). Similarly, the lessees are under a lease obligation to use due diligence in performing under their respective leases. *See, e.g.*, Lease No. 1240 (I-96-Ind-6534), § 3(k) (July 30, 1940); Lease No. 14-20-0258-2192, § 3(i) (Apr. 16, 1968). Beyond any explicit lease terms, oil and gas lessees have long been held to be subject to an implied covenant to conduct operations with reasonable care and due diligence – according to the standard of a prudent operator. *See, e.g.*, *Brewster v. Lanyon Zinc Co.*, 140 F. 801, 810-11, 814 (8th Cir. 1905); Howard R. Williams & Charles J. Meyers, *Oil & Gas Law* § 861 (2d ed. 2004). The leases also specifically accord the Secretary of the Interior the power to terminate a lease for failure to perform any obligation. *See, e.g.*, Lease No. I-96-Ind-7083, § 6 (Nov. 20, 1942); Lease No. 14-20-0258-3566, § 6 (Sept. 27, 1974).

In numerous instances, oil and gas was not produced by lessees of the Tribes for considerable periods after the primary term expired. In some instances, production ceased for several months or more, then subsequently resumed. In other instances, oil and gas wells were drilled and completed, but actual production was delayed for substantial periods. By the terms of

the underlying leases, such non-production constituted grounds for termination, as the length of these delays exceeded the time which might be reasonable under the standard of a prudent operator. *See, e.g.*, *Citation Oilfield Supply & Leasing Ltd. v. Acting Billings Area Dir., Bureau of Indian Affairs*, 27 I.B.I.A. 210 (Mar. 7, 1995) (ruling that a 39-day shut-in for mechanical repairs was unreasonable under a prudent operator standard, warranting termination of an oil and gas lease on tribal lands).

In other instances, the United States allowed lessees to carryover beyond the primary term when the lease was producing minimally, but not in paying quantities. The United States would also at times extend the deadline for drilling obligations during the primary term for several years so that the lease would not expire, even though no work had been done by the company to develop the property.

The Government's failure to terminate these leases for unreasonable periods of non-production, or when minerals were not produced in paying quantities, or when lessees failed to drill required wells, denied the Tribes the opportunity to accept new lease bids with more favorable terms on lands known to be productive. This is, again, an instance of the Government's failure to enforce existing lease terms in violation of its money-mandating obligation as trustee for the Tribes. The damages to the Tribes include, without limitation, increased royalties the Tribes would otherwise have received from a new lease bid after termination. Such increases can be determined from bids received and leases issued contemporaneously on similar properties.

*Time Period.* The time period for this claim with respect to each lease extends from the date of the Government's failure or refusal to terminate a lease for non-production until

December 31, 2000. The dates of such failure or refusal to terminate vary by lease. Instances have occurred both before and after October 10, 1973.

## VII. FAILURE TO REQUIRE COMPENSATION FOR DRAINAGE.

The Government failed to enforce the leases and regulations and protect the Tribes' minerals from, and compensate them for, drainage. Drainage occurred when oil or gas underlying tribal lands was allowed to be produced from non-Tribal wells or produced from wells with a lower royalty rate. When the drainage occurred, the Government should have required the payment of compensation or the drilling of offset wells. Under Indian oil and gas leases, as stated in Section V above, lessees have the duty to "drill and produce all wells necessary to offset or protect the leased land from drainage, or in lieu thereof to compensate the lessor in full each month for the estimated loss of royalty through drainage." Similarly, the regulations provide that the lessee shall protect the lease from drainage and, in instances where drainage occurred, impose reasonable terms and conditions to protect the Tribes including the payment of compensatory royalties. *See, e.g.,* 25 C.F.R. §§ 211.47(b), 227.23. The lease provisions and regulations regarding drainage are money-mandating requirements that oil and gas lease terms related to trust land under the supervision of the Secretary of the Interior be enforced.

In 1965, the Tribe brought to the Secretary's attention its belief that gas was being drained from the Enos lease in the Pilot Butte Field and asked for the Secretary to require the lessee to protect the Tribes against such drainage. Although the facts were clear that tribal lands were being drained, the Secretary did not require an offset well or compensatory royalties, or seek communitization. The loss of gas can be estimated using established techniques, and the value of the gas is readily ascertainable. As late as 1986, the Bureau of Land Management

(BLM) investigated the Enos drainage issue and referenced the Government's vulnerability to a lawsuit regarding this matter. The Tribes continue to investigate other potential drainage claims.

*Time Period.* The time period for each drainage claim is from the date of the onset of drainage through December 31, 2000.

## VIII. FAILURE TO COLLECT RENTAL PAYMENTS.

The Government is obligated to maintain accounts and enforce collection of non-royalty payments due the Tribes under federal statutes and regulations, including shut-in payments or rentals, *see, e.g.,* 30 C.F.R. §§ 221.12, 221.16 (1942), and may be held liable for its failure to collect rental payments that should have been collected under proper management. *See Navajo Tribe of Indians v. United States,* 9 Cl. Ct. 227, 233 (1985) (citing G. Bogert, *The Law of Trusts and Trustees* § 799 (2d ed. 1981)). The regulations and leases at issue here include requirements for payment of such rentals, but the Government at times failed to collect these payments from oil company lessees, or improperly credited them against royalties.

For periods prior to October 10, 1973, the Tribes seek damages for rental payments that should have been collected, or which were improperly credited against royalties.

## IX. INTEREST.

The Tribes are entitled to interest on all amounts the Government failed to collect with regard to oil and gas, pursuant to the decision of the Court of Appeals for the Federal Circuit regarding interest in *Shoshone Indian Tribe v. United States,* 364 F.3d 1339 (Fed. Cir. 2004), *cert. denied* 125 S. Ct. 1824, 1826 (Apr. 18, 2005).

## X. ATTORNEYS' FEES.

Finally, the Tribes also assert a claim under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA") and the law of trusts for attorneys' fees, expenses, and costs incurred in connection with this case. The Tribes reserve their right to pursue this claim following final judgment in this phase of the litigation.

EAJA permits a party to recover attorneys' fees and other expenses against the United States if: (i) the party prevails in the litigation; (ii) the position of the United States was not substantially justified; (iii) the net worth of the party does not exceed $7,000,000 at the time the lawsuit was filed; and (iv) the party did not have more than five hundred employees at the time the lawsuit was filed. *Id.* Under EAJA, the Government is liable "to the same extent that any other party would be liable" for fees and expenses under the common law or a statute providing for such an award. 28 U.S.C. § 2412(b). "Fees and other expenses" include the reasonable expenses of expert witnesses, costs incurred in preparing reports or analyses necessary to the case, and reasonable attorneys' fees. 28 U.S.C. § 2412(d)(2)(A). EAJA requires submission of a claim for fees and expenses thirty days after a final judgment is entered. 28 U.S.C. § 2412(d)(1)(B).

Similarly, the Tribes assert a claim to attorneys' fees, costs, and expenses under general principles of trust law, and courts have discretion to award attorneys' fees to trust beneficiaries in cases involving breach of the trustee's fiduciary duties. *See* 76 Am. Jur. 2d Trusts § 736 (1988 & Supp. 2002) ("[W]hen an action is brought successfully against a trustee for breach of his trust, the award of an attorney's fee to the plaintiff is proper").

## XI. RESERVED ITEMS.

Certain of the Tribes' claims are explicitly excluded from this phase of the litigation, and the Tribes reserve the right to present them in future phases. These include, but are not necessarily limited to, the following:

*Trust Fund Claims.* All claims related to trust funds, that is, to actions or inactions of the Government after first receipt of funds by any entity or agent of the Government, including claims relating to funds held in special deposit accounts, are reserved for the trust fund mismanagement phase of this litigation. *See* Order of Aug. 27, 2004, at 2, § 4. These include Claims II through VI of the Arapaho Tribe's original Petition in this action, and Claims II through VII of that of the Shoshone Tribe. *See* Stipulation for Dismissal of Claims Regarding "Oil and Gas Phase One Issues" § 6. Without limitation, trust fund claims include claims that tribal funds collected by the Government were not timely deposited into interest-bearing accounts, were not properly invested or were invested at inadequate interest, were misspent, or were not properly accounted for.

*Environmental Claims.* The Tribes' environmental claims, or claims relating thereto, are also excluded from this subdocket and are reserved for separate treatment following trial or settlement of the current phase. Order of Aug. 27, 2004, at 2, § 2.

DATED: January 13, 2006.

Respectfully submitted,

s/Harry R. Sachse
by R. Berley w/auth'n
Harry R. Sachse
*Counsel of Record*
Anne D. Noto
SONOSKY, CHAMBERS, SACHSE
ENDERSON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
(202) 682-0240 (Telephone)
(202) 682-0249 (Facsimile)
hsachse@sonosky.com
*Attorneys for Eastern Shoshone Tribe*

s/Richard M. Berley
Richard M. Berley
*Counsel of Record*
Brian W. Chestnut
ZIONTZ, CHESTNUT, VARNELL,
BERLEY & SLONIM
2101 4th Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 (Telephone)
(206) 448-0962 (Facsimile)
rberley@zcvbs.com
*Attorneys for Northern Arapaho Tribe*

Susan M. Williams
Lisa K. Condon
WILLIAMS & WORKS, P.A.
P.O. Box 1483
Corrales, New Mexico 87048
(505) 899-7994 (Telephone)
(505) 899-7972 (Facsimile)
swilliams@williamsandworks.net
*Attorneys for Eastern Shoshone Tribe*

**CERTIFICATE OF SERVICE**

I certify that the foregoing pleading is to be served on Terry Petrie, counsel of record for the United States, contemporaneously with this filing via the Court's electronic filing system.

/s Richard M. Berley